UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA FOSEN,

                    Plaintiff,

      -v-

THE NEW YORK TIMES,

                    Defendant.

Case No. 03-CV-3785 (KMK)(THK)

OPINION AND ORDER

Appearances:

Patricia Fosen
Brooklyn, NY
*Pro Se Plaintiff*


Neil H. Abramson, Esq.
Peter B. Rahbar, Esq.
Proskauer Rose LLP
New York, NY
*Counsel for Defendant*


KENNETH M. KARAS, District Judge:

      On May 26, 2003, Patricia Fosen ("Plaintiff") brought this action *pro se* against her former employer, The New York Times ("Defendant" or "the Times"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Age Discrimination in Employment Act of 1967, as amended, codified at 29 U.S.C. §§ 621-34 ("ADEA").  Plaintiff worked for Defendant as an advertising sales agent (known as a "Copy Passer") and alleges that she was demoted in May 2002 and terminated in October 2002 because of her gender and age, subject to a hostile work environment based on her gender, and subject to retaliation for protected activity under Title VII.  (Compl. ¶ 4)

On August 19, 2003, the case was referred to Magistrate Judge Theodore H. Katz for general pre-trial supervision and for a Report and Recommendation on any dispositive motion.[1] Both parties proceeded with discovery, and on April 23, 2004, Defendant moved for summary judgment, arguing, *inter alia*, that Plaintiff could not make out a *prima facie* case of gender or age discrimination and that she was terminated for legitimate, non-discriminatory reasons, including her insubordination and failure to improve her work performance.  Defendant also argued that Plaintiff's harassment claim failed because there was no evidence that the alleged conduct occurred because of Plaintiff's gender, and that her retaliation claim failed because she could not show that Defendant was aware of Plaintiff's protected activity at the time of her termination.

On October 21, 2004, Magistrate Judge Katz issued a Report and Recommendation advising that Defendant's motion for summary judgment be granted as to all of Plaintiff's claims. Plaintiff timely filed objections on November 5, 2004 (Pl.'s Opp'n to Judge Katz's Report and Recommendation ("Pl.'s Objections")), Defendant responded to these objections on November 22, 2004 (Def.'s Mem. of Law in Resp. to Pl.' Objections ("Def.'s Resp. to Objections")), and Plaintiff replied on December 2, 2004 ("Pl.'s Reply").  After having carefully reviewed the record and the applicable law, for the reasons that follow, the Court adopts the Report and Recommendation and orders that Defendant's motion for summary judgment be granted.

---

[1]This case was reassigned from the Honorable Alvin K. Hellerstein, U.S. District Court Judge, to the undersigned for all purposes on September 17, 2004.

### I.  Factual Background

The facts are extensively presented in the Report and Recommendation, which follows this Opinion and Order, and familiarity with which is assumed here.  In brief, Plaintiff is a 52 year-old woman who began selling classified advertisements for the Times in 1997.  (Def.'s Mem. of Law at 2; Rahbar Decl., Ex. 1, Fosen Dep. at 20-21, 23, 26)  After her promotion from a "Group 4 Telephone Sales Ad-visor" to a "Group 7 Senior Telesales Representative" in 1999, Plaintiff's annual performance reviews for 1999 and 2000 reflected criticisms of her interpersonal skills, and prompted Plaintiff's similar criticisms of her supervisor's workplace conduct.  (Rahbar Decl., Exs. 8-10)  On July 12, 2001, at a meeting with Brenda Watson, Director of Employee Relations, Joan Motyka, Manager of Labor Relations, and Art Mulford, Plaintiff's representative from the Newspaper Guild of New York ("the Guild"), Plaintiff was suspended without pay for a week for allegedly calling a white co-worker a racist.  (Rahbar Decl., Ex. 14, Fosen Dep. at 146-51)

Around the same time, Plaintiff had become a "Group 7 Advertising Production Coordinator" — a position also known as a "Copy Passer" — which she considered a beneficial transfer.  (Fosen Dep. at 153)  In her new position, Plaintiff had persistent conflicts with Vito Rampulla, another Copy Passer, whom Plaintiff has described as a "Frank-Sinatra want-to-be" who pushes women around.  (Pl.'s Aff. Opposing Mot. for Summ. J. ("Pl.'s Aff.") at ¶¶ 37-38)  For example, Plaintiff found it offensive that "Rampulla refers to younger women in the work place as cupcakes, pumpkins, sweets — ageless euphamisms for women's breasts."  (Pl.'s Aff. at ¶ 39)  Plaintiff objects that Magistrate Judge Katz failed to acknowledge in his Report and Recommendation that "Rampulla's abusiveness was exclusively toward WOMEN co-workers."

(Pl.'s Objections at 4)  According to Plaintiff's deposition testimony, however, Rampulla also directed abusive conduct at Leo Robles, one of his male co-workers.  (Pl.'s Dep. at 170, 187-88, 232, 402, 405)  Plaintiff further alleged that when Rampulla stood up to make a daily work-related announcement near her desk, he shook his finger at crotch level in a way that she alternately describes as a "disgusting" masturbation gesture (Pl.'s Aff. ¶ 97) and a "wagging . . . up and down nervously" (Pl.'s Dep. at 214).

Leslie Hoenninger, who supervised both Plaintiff and Rampulla in their Copy Passer positions, received sharp complaints from supervisory personnel and from Plaintiff's co-workers concerning Plaintiff's treatment of other people at work.  (Rahbar Decl., Exs. 16, 17) Confrontations also arose between Hoenninger and Plaintiff concerning Plaintiff's work schedule (Rahbar Decl., Ex. 15) and work procedures (Pl.'s Aff. ¶¶ 63, 69).

At a meeting on May 31, 2002, Plaintiff was transferred back to a position as a "Group 4 Ad-visor" with no pay reduction.[2]  (Pl.'s Dep. at 247-54)  When supervisory personnel learned that Plaintiff had secretly tape-recorded this meeting, Motyka informed Plaintiff that such conduct was contrary to the Times' written rules requiring employees to treat each other with "honesty, respect and civility."  (Rahbar Decl., Ex. 26)  In the following months, Plaintiff and her supervisors had repeated confrontations in the workplace and over e-mail concerning Plaintiff's schedule and productivity.  (Rahbar Decl., Exs. 28-33)

---

[2] When Plaintiff filed an unfair labor practice charge against the Guild with the National Labor Relations Board ("NLRB"), alleging that the Guild had failed to process her grievance regarding the transfer for discriminatory reasons, the NLRB concluded upon investigation that the Guild had not breached its duty of fair representation but, instead, had determined based on an underlying arbitration proceeding not to "proceed with [Plaintiff's] grievance because [the Times] could demote [Plaintiff] without cause, as long as, [Plaintiff's] salary was not reduced." (Rahbar Decl, Ex. 22, Letter to Pl. from NLRB, dated Sept. 27, 2002 at 1)

Plaintiff began bringing a tape recorder to work and keeping it in her purse.  (Pl.'s Aff. at 56)  Although Plaintiff claims that the tape recorder was out of plain view, other employees complained that it made them uncomfortable and Hoenninger claimed it could be seen at the top of Plaintiff's purse.  (Rahbar Decl., Ex. 4, Halley Dep., Tape 1 at 21-22, 26-27, Tape 2 at 22-23; Rahbar Decl., Ex. 2, Hoenninger Dep., Tape 3 at 74-77, 83-89)  Plaintiff received a performance warning letter on September 24, 2002 ("September performance warning"), and a meeting was scheduled to discuss the warning on October 3, 2002, with Plaintiff, Corinne Osborn, Charlotte Behrendt of the Times' Labor Relations officer, and Guild representatives.  (Rahbar Decl., Exs. 38, 39)  The meeting was adjourned and Plaintiff was suspended when Plaintiff would not agree to proceed with the meeting without the use of her tape recorder.  (Pl.'s Dep. at 429-32; Rahbar Decl., Ex. 40)

Plaintiff later agreed to proceed without the tape recorder at a meeting on October 17, 2002, with Osborn, Behrendt, Hoenninger, and Guild representatives.  There is some dispute as to what was said at this meeting.  As Magistrate Judge Katz recounts, "Plaintiff contends that she never expressly refused to meet the Times' standards, rather she refused to agree to Behrendt's assessment that they had not been met.  By not agreeing to cooperate in improving her performance, Plaintiff was aware that she risked termination."  (Report and Recommendation at 13-14) (internal citations to record omitted)  Toward the end of this meeting, Plaintiff informed the group that she "had gone to" the Equal Employment Opportunity Commission ("EEOC") because of "the harassment and the hostile work environment."  (Pl.'s Aff. ¶¶ 29-30; Pl.'s Dep. at 446-47)  On October 22, 2002, Behrendt terminated Plaintiff because of her insubordination, her refusal to heed the September performance warning, and her statements that she did not believe

that her performance needed improvement.  (Rahbar Decl., Ex. 44)

## II.  Discussion

### A.  Standard of Review

A district court reviewing a report and recommendation deciding a dispositive motion "'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.'"  *Reyes v. Mantello*, No. 00 Civ. 8936, 2003 WL 76997, at *1 (S.D.N.Y. Jan. 9, 2003) (quoting 28 U.S.C. § 636(b)(1)(C)).  Under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, parties may submit objections to the magistrate judge's report and recommendation.  The objections must be "specific" and "written," *see* Fed. R. Civ. P. 72(b), and must be made "within 10 days after being served with a copy of the recommended disposition."  *Id*.; *see also* 28 U.S.C. § 636(b)(1)(C).

If a party submits a timely objection to a report and recommendation, as Plaintiff has here, the district judge will review the parts of the report and recommendation to which the party objected under a *de novo* standard of review.  *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b) ("The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule.").

The district court may adopt those portions of a report to which no objections have been made, as long as those portions are not facially erroneous.  *See Pizarro v. Bartlett*, 776 F. Supp. 815, 817 (S.D.N.Y. 1991).  Where, as here, a litigant proceeds *pro se*, the Court reads the

6

litigant's supporting papers and submissions liberally, and interprets them to raise the strongest

arguments that they suggest.  *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

### B.  Plaintiff's Discrimination Claims

Magistrate Judge Katz began by evaluating Plaintiff's gender and age discrimination

claims according to the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802-04 (1973) and *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 252-53

(1981).[3]  It is Plaintiff's initial burden to prove by the preponderance of the evidence a *prima*

*facie* case of discrimination.  *See Burdine*, 450 U.S. at 252-53; *see also St. Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 506 (1993) (noting plaintiff's burden); *McPherson v. New York City Dept.*

*of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (same).  To establish a *prima facie* case of either

gender or age discrimination, the plaintiff employee must produce evidence showing that: (1)

plaintiff was a member of a protected class (or age group); (2) plaintiff was qualified for the

position or satisfactorily performed her duties; (3) plaintiff suffered an adverse employment

action; and (4) the adverse action occurred under circumstances giving rise to an inference of

discrimination.  *See Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 187 (2d Cir. 2006); *Abdu-*

*Brisson*, 239 F.3d at 466.

After the plaintiff has made out a *prima facie* case, "the employer is required to offer a

legitimate, nondiscriminatory business rationale for its actions.  If the employer articulates such a

---

[3] This analysis applies equally to discrimination claims under Title VII and the ADEA.
*See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (recognizing applicability of
*McDonnell Douglas* framework to both Title VII claims and ADEA claims); *Terry v. Ashcroft*,
336 F.3d 128, 138 (2d Cir. 2003) (same); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456,
466 (2d Cir. 2001) (same).

reason, the presumption of . . . discrimination dissolves, and the burden shifts back to the

plaintiff to prove that the employer's stated reasons are merely pretextual and that [unlawful]

discrimination was the true reason for the adverse employment action." *Abdu-Brisson*, 239 F.3d

at 466 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-04); *see also Graves*, 457 F.3d at 187.

Based on this framework, Magistrate Judge Katz correctly concluded that Plaintiff has

satisfied the first and third elements of a *prima facie* case because Plaintiff is a woman who was

over 40 years old when Defendant terminated her employment.  The second element —

satisfactory performance of her duties — is disputed.  However, recognizing that the Second

Circuit has characterized Plaintiff's *prima facie* burden as *de minimis*, *see Woodman*, 411 F.3d at

76, Magistrate Judge Katz took Plaintiff's claims of "perfect" performance at face value,

assumed her satisfaction of this second element, and proceeded with an analysis of the parties'

conflicting claims about the quality of Plaintiff's work in the context of the fourth element.

(Report and Recommendation at 20-21)  In this respect, Magistrate Judge Katz's concluded, and

the Court agrees, that Plaintiff fails to satisfy the fourth element of a *prima facie* case —

circumstances giving rise to an inference of discrimination — because:

> Plaintiff has only offered evidence of non-discriminatory reasons,
> unrelated to age and gender, for her adverse treatment.  For
> example, Plaintiff asserts that she was retaliated against because
> (1) Plaintiff spearheaded an effort to obtain benefits for part-time
> employees and raised concerns regarding her status as a part-time
> employee; (2) Plaintiff had taken a sick day against the wishes of
> her supervisor; (3) Plaintiff had made complaints to superiors
> about her supervisor, [Leslie] Hoenninger, using profanity in the
> workplace; and (4) Plaintiff had severe personality conflicts with
> Hoenninger.

(Report and Recommendation at 22 (collecting citations to Pl.'s Aff. and Pl.'s Dep."))[4]

The Report and Recommendation also pointed out the absence of any evidence that Hoenninger or other supervisors treated similarly situated male employees or younger employees more favorably than they treated Plaintiff.  (Report and Recommendation at 22-23)  To the contrary, Plaintiff's deposition testimony describes situations in which Hoenninger favored an employee (Rampulla) who is older than Plaintiff (Pl.'s Dep. at 185-86), and disfavored a male employee (Leo Robles):

> [Rampulla] would complain about Leo [Robles] to Leslie and then Leslie would come flying out of her office and just lay her wrath on Leo, and more often than that Leo was right . . . .  They put him in the absentee control [program] when — I mean, he was absent so much fewer times than, say, Janet Elliott, who was Vito Rampulla's girfriend . . . .  [A]t the baiting of Vito Rampulla, [Leslie] was just nasty to him, just nasty, the way a professional business person in any office shouldn't be.

(Pl.'s Dep. at 402-03)

Any inference of discrimination was also critically undermined by the fact that the supervisors responsible for Plaintiff's termination and transfer were both women, one of whom

---

[4] As plaintiffs in Title VII cases are often "constrained to rely on circumstantial evidence," *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994), the "inference of discriminatory intent could be drawn in several circumstances including, but not limited to:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

*Abdu-Brisson*, 239 F.3d at 468 (quoting *Chambers*, 43 F.3d at 37 (internal citations omitted)).

was three years Plaintiff's senior.  (Report and Recommendation at 23)[5]  Similarly, there is no

inference of discriminatory intent to be drawn from Defendant's post-termination hiring conduct,

as Plaintiff was not replaced with someone outside of either protected group.  (Report and

Recommendation at 23-24)[6]

     Plaintiff repeatedly objects that Magistrate Judge Katz "refused to recognize the timing of

Rampulla's confrontational and harassing behavior toward me, his consultations with

Hoenninger immediately following those confrontations, and Hoenninger's immediate response

---

[5]Such a premise finds support in decisions in this District, if not the Second Circuit.  *See Zuffante v. Elderplan, Inc.*, No. 02 Civ. 3250, 2004 WL 744858, at *6 (S.D.N.Y. Mar. 31, 2004) (noting that invidious discrimination especially unlikely when, *inter alia*, the decision-maker is in the same protected class as plaintiff); *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 209 (S.D.N.Y. 2000) (noting inference against discriminatory intent when decision-makers are in same protected class as plaintiff); *Toliver v. Cmty. Action Comm'n to Help the Economy, Inc.*, 613 F. Supp. 1070 (S.D.N.Y. 1985) (noting that if decision-maker is in the same protected class as plaintiff, claims of discrimination become less plausible).  While shared membership in a protected class may make a decision-maker less likely to hold or act on overt animus towards another member of the class, *see Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) (counting among the factors belying an inference of age discrimination the fact that "Bacolas, who caused Grady to be fired, was the very person who had hired her just eight days earlier . . . [and was] also a year older than Grady."), it is not beyond reason that such a decision-maker might advance a discriminatory agenda.  In Plaintiff's case, however, the Court finds no evidence of age- or gender-based animus on the part of the three decision-makers.

[6] Plaintiff objects to this conclusion, reiterating her allegation that after Plaintiff was transferred from the Copy Passer position to the Ad-visor position in June 2002, Defendant passed over several more experienced men over age 40 and replaced Plaintiff with Glorie Chan, a younger, inexperienced woman.  (Pl.'s Objections at 32)  However, Hoenninger testified at her deposition that Plaintiff's copy-passing responsibilities were redistributed between Rampulla and Robles, and that Chan did copy passing "if [they] got jammed at the end of the day" on an "ad hoc" basis.  (Rahbar Decl. Ex. 2, Hoenninger Dep., Tape 2 at 67-68)  Plaintiff's deposition testimony also confirms that Chan was pinch hitting as a Copy Passer before the time of Plaintiff's transfer out of that position.  (Pl.'s Dep. 263-266)  Thus, Magistrate Judge Katz's conclusion that there is no discriminatory inference to be drawn from Chan's assumption of copy-passing responsibilities on an "ad hoc" basis, both before and after Plaintiff's termination, is well-founded.

which was to accuse me of some wrongdoing using Rampulla's language." (Pl.'s Objections at

31) In this regard, Plaintiff describes Hoenninger as acting against Plaintiff at Rampulla's behest

or as a mouthpiece for Rampulla's discrimination. However, she points to no evidence that

Hoenninger's actions were motivated by discrimination based on Plaintiff's gender or age.[7]

Although Plaintiff has not made even the "very minimal showing necessary to require the

employer to come forward with an explanation for the challenged action," *Starr v. Legal Aid*

*Soc'y of N.Y.*, No. 96 Civ. 6888, 1998 WL 477733, at *3 (S.D.N.Y. Aug. 14, 1998) (citing *Fisher*

*v. Vassar Coll.*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (*en banc*)), Magistrate Judge Katz

nonetheless evaluated Defendant's rebuttal evidence. *See U.S. Postal Serv. Bd. of Governors v.*

*Aikens*, 460 U.S. 711, 715-716 (1983) (explaining that regardless of whether plaintiff has made a

*prima facie* case, the district court should evaluate defendant's rebuttal evidence because the

court "has before it all the evidence it needs to decide whether 'the defendant intentionally

discriminated against the plaintiff'") (quoting *Burdine*, 450 U.S. at 253).

As stated in Plaintiff's termination letter dated October 22, 2002, Defendant has

asserted that Plaintiff was terminated because of her insubordination and her refusal to improve

her performance — as was initially requested by the September performance warning and the

subsequent meeting on October 17, 2002. (Report and Recommendation at 25) The September

performance warning described Plaintiff's low advertising productivity for June, July, and

---

[7] In support of her opposition to Defendant's motion, Plaintiff has submitted an internal performance review from the Times, evaluating Hoenninger's performance in 1983 and describing Hoenninger as "argumentative," "abrupt to the point of being rude," and "destroy[ing] the morale of our group." (Pl.'s Aff., Ex. 10 at D01174) Although this review is dated, it nevertheless suggests that Plaintiff's exchanges with Hoenninger derive from Hoenninger's difficulty supervising her employees and her questionable management style, not from gender- or age-based animus.

August 2002, her tardiness, and her inappropriate behavior towards co-workers and supervisors, emphasizing Plaintiff's unacceptable use and display of a tape recorder in the office.  (Rahbar Decl., Ex. 39)  Defendant contends and Plaintiff admits, that at the meeting on October 17, 2002, Plaintiff would not acknowledge her inadequate productivity or her lateness, and would not agree to stop bringing a tape recorder to work.  (Rahbar Decl., Ex. 5, Mulford Dep. at 40-42, 48-52; Pl.'s Dep. 443-447, 450-51)

With respect to Defendant's proffered non-discriminatory reasons for Plaintiff's termination, one of Plaintiff's principal arguments, discussed extensively in both her opposition to Defendant's summary judgment motion and her objections to the Report and Recommendation, is that poor performance cannot be a legitimate non-discriminatory reason for her termination because Defendant deliberately never informed her of the standards for, or expectations of, her performance in her new position as Copy Passer.[8]  (Pl.'s Aff. at 53-54; Pl.'s Objections at 35-38)  Indeed, it is evident that at the meeting on October 17, 2002 , Plaintiff responded to complaints about her work performance by asking repeatedly for a definitive set of performance standards (Rahbar Decl., Ex. 5, Mulford Dep. at 52), perhaps in an attempt to make her point that she could not be terminated for failing to meet standards that were not well-

---

[8]At her deposition, Plaintiff gave the following testimony:

> I believe that Leslie Hoenninger and Corinne Osborn put a little
> plan together whereby they would put me in this e-mail job.  They
> wouldn't tell me what the performance expectations were.  And
> then they would just keep telling me I was doing a bad job.  And
> maybe it would take a couple of warnings before they could get rid
> of me, but that's what the plan was.

(Pl.'s Dep. at 476-77)

established.

However, Art Mulford, one of the Guild Representatives who attended the meeting on Plaintiff's behalf, testified in response to Plaintiff's questions at his deposition that Defendant's representatives (including Osborn, Behrendt, and Hoenninger) "gave percentages of what you were doing and where they wanted you to go," and "the crux of the matter was, they wanted you to make an effort to go towards that and that you had categorically denied that you were going to make that effort. You stated that you were not going to make any effort to do beyond what you were doing." (Rahbar Decl., Ex. 5, Mulford Dep. at 54) Based on their deposition testimony, Plaintiff and Mulford are in agreement that the Guild representatives warned Plaintiff during the meeting recess that she risked losing her job if she did not agree to improve her work performance. (Pl.'s Dep. at 452-53; Pl.'s Objections at 38; Mulford Dep. at 55-56) According to the Guild, the Guild representatives "informed [Plaintiff] that the lack of a negotiated or otherwise established quota [for her sales] did not prevent the Times from determining that her productivity was unsatisfactory." (Rahbar Decl., Ex. 42, Letter to NLRB from the Guild at 1)

Nevertheless, even aside from Plaintiff's refusal to admit any inadequacies in her work performance or pledge any improvement, she also refused to acknowledge or address the inter-personal difficulties with her supervisors and co-workers, and the inappropriate use of the tape recorder. It is well-established that "[a]n employer may permissibly terminate an employee based on [the employee's] inappropriate comments, perceived insubordination or disruptive behavior in the workplace." *Chapkines v. New York Univ.*, No. 02 Civ. 6355, 2005 WL 167603, at *8 (S.D.N.Y. Jan. 25, 2005) (collecting cases) (finding that plaintiff's classroom remark in violation of sexual harassment policy, rudeness to staff members, and inaccessibility by

telephone were legitimate, non-discriminatory reasons for defendants' decision not to reappoint plaintiff as university professor). Accordingly, the Court concurs with Magistrate Judge Katz's conclusion that Defendant's "[d]issatisfaction with Plaintiff's work performance and on-the-job conduct constitutes a legitimate, non-discriminatory reason for Defendant's actions." (Report and Recommendation at 25)

Finally, Plaintiff has failed to present any evidence that her on-the-job conduct was used as a pretext for discrimination. Citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), Plaintiff argues that her evidence of pretext is sufficient to survive Defendant's summary judgment motion. However, Plaintiff has not presented sufficient evidence to rebut Defendant's non-discriminatory reasons for her termination. Even after *Reeves*, Plaintiff at least "must introduce evidence raising an issue of material fact as to whether defendants have honestly and truthfully set forth their reasons" for terminating her. *Chapkines*, 2005 WL 167603, at *9 (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)) (holding that plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]") (citations and internal quotations omitted).

In her Objections and her opposition papers, Plaintiff attempts to satisfy this burden by arguing that Defendant has falsely accused her of being late despite the evidence of her punctuality, has exaggerated her difficulties with colleagues, and has improperly penalized her poor performance after deliberately withholding clear standards. (Pl.'s Objections at 39-43)[9]

---

[9] Plaintiff specifically objects that Defendant has provided no documentary evidence of her lateness, that attendance sheets demonstrate that she did not have a problem arriving to work on time, and that this discrepancy indicates Defendant's pretextual conduct. (Pl.'s Objections at

However, the record of e-mails and deposition testimony concerning Plaintiff's unwillingness to

conform to Defendant's scheduling expectations, productivity standards, and conduct guidelines

is extensive.  Plaintiff objects that she was never given appropriate standards.  But the standards

for e-mail ad productivity were based on those used for telephone and fax ads, and both the

Times and the Guild had accepted them.  (Rahbar Decl., Ex. 2, Hoenninger Dep., Tape 4 at 3;

Rahbar Decl., Ex. 33)  Indeed, Mulford, Plaintiff's Guild representative at the October 17, 2002

meeting, testified at his deposition that if the Times had given Plaintiff the kind of standard she

demanded at the meeting, the Guild "would probably object to any kind of standard that they

made."  (Rahbar Decl., Ex. 5, Mulford Dep. at 53)  The question raised by Plaintiff's

discrimination claims is not whether Defendant's personnel decisions were wise ones, "but

merely . . . whether the decisions were rational and non-discriminatory."  *Sarmiento*, 2005 WL

396385, at *3 (citing *Tarshis v. Riese Org.,* 211 F.3d 30, 37 (2d Cir. 2000)).

---

40-41; Pl.'s Aff., Ex. 6)  Defendant's evidence of Plaintiff's lateness is the observation of Phyllis
Baisden, who was responsible for keeping attendance records showing that Plaintiff regularly
arrived late, which Baisden communicated to Hoenninger.  (Rahbar Decl., Ex. 3, Deposition of
Phyllis Baisden at 26)  The Court agrees with Plaintiff that this evidence would be stronger if it
was supported by routine attendance logs.  However, Plaintiff submits only selected attendance
logs recording her punctual arrival at work for ten days in the month of August 2002.  (Pl.'s Aff.,
Ex. 6)  While these records dispute Defendant's characterization of Plaintiff's lateness as a daily
occurrence (Rahbar Decl., Ex. 39), they are not sufficient to create a disputed question of fact as
to whether Plaintiff had a problem with punctuality.

Moreover, in view of the extensive documentation and testimony concerning Plaintiff's
poor performance and the persistent inter-personal problems between Plaintiff and her co-
workers and supervisors, even absent Plaintiff's lateness, Defendants have demonstrated non-
discriminatory, non-pretextual reasons for Plaintiff's termination.  *See Sarmiento v. Queens Coll.
CUNY*, No. 01 Civ. 5266, 2005 WL 396385, at *11 (E.D.N.Y. Feb. 11, 2005) (finding
inconsistencies in defendant's statements regarding knowledge of plaintiff's ethnicity
"insufficient to raise a material issue of fact regarding pretext, because the evidence is minor and
inconclusive as compared to overwhelming evidence that [d]efendant chose not to hire [p]laintiff
for exactly the reason they stated . . .").

As Magistrate Judge Katz noted, the e-mails exchanged between June and October 2002 establish Defendant's dissatisfaction and frustration with Plaintiff's job performance, specifically with her inability to get along with her co-workers and supervisors, with her refusal to acknowledge the inappropriateness of bringing a tape recorder to work and using it at meetings, and with her productivity.  (Rahbar Decl., Exs. 26-28, 33, 38)  That Plaintiff acknowledges some of her own misbehavior — such as her insistence on bringing the tape recorder to work — but simply takes a different view of this conduct, weakens rather than strengthens her claim of pretext.

Based on its review of the record, the Court agrees with Magistrate Judge Katz's assessment that, "Plaintiff has failed to come forward with any competent evidence that would permit a reasonable trier of fact to conclude that the reasons given for her termination or any other employment action by Defendant were pretextual, and that the real reason for her termination was her gender or age."  (Report and Recommendation at 31)  Magistrate Judge Katz rightly concluded that, "[i]n essence, Plaintiff's claim is based merely on the fact that she is a woman over forty years of age who was terminated based on performance criteria with which she disagrees."  (*Id.*) (citation omitted)

C.  Plaintiff's Hostile Work Environment Claim

To establish the existence of a hostile work environment in connection with a sexual harassment claim under Title VII, Plaintiff must show:  (1) that she is a member of a protected group; (2) that she was subjected to unwelcome conduct; (3) that the conduct was based on her sex; and (4) that the conduct was sufficiently severe or pervasive to alter the conditions of her employment.  *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir. 1993)*; see also*

16

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 78 (1998).  The Second Circuit has "explained that '[t]his test has objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'"  *Terry*, 336 F.3d at 148 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)) (internal quotations omitted).

The court may assess a plaintiff's hostile work environment claims based on factors such as "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Terry*, 336 F.3d at 148 (quoting *Harris*, 510 U.S. at 23).  Generally, the episodic incident is not enough and behavior must be "sufficiently continuous and concerted in order to be deemed pervasive."  *Alfano*, 294 F.3d at 374 (additional internal quotation and citation omitted).

Plaintiff alleges that Rampulla harassed her and other women in their office by becoming hostile when Plaintiff declined Rampulla's invitations to attend social functions with him, by shaking his finger in what looked like a masturbation gesture during a daily announcement to the office, and by calling younger female employees (but not Plaintiff) nicknames such as "pumpkin" and "cupcake."  However, based on its review of the record, the Court agrees with Magistrate Judge Katz's assessment that "there is no basis to conclude that Rampulla's nervous finger shaking or annoyance when Plaintiff declined his lunch and dinner invitations was gender-based harassment."  (Report and Recommendation at 46)  Plaintiff characterized the finger shaking as "disgusting" but also described it as a "nervous" shake, and has provided no evidence that the

17

gesture was directed at her or any other women in the office.  Similarly, Plaintiff acknowledges that Rampulla extended social invitations to other people in the office — both men and women. (Pl.'s Dep. at 237-38)  In this regard, although Plaintiff claims that Rampulla's conduct was gender-based because he was not similarly temperamental with men, her deposition testimony indicates that Rampulla was quite hostile to Leo Robles, one of his male co-workers.  (Pl.'s Dep. at 170, 187-88, 232, 402, 405)

Even assuming that Rampulla's use of nicknames was gender-based, this conduct, even in combination with the other alleged harassment, was not sufficiently severe or pervasive to alter, in objective terms, the conditions of Plaintiff's employment.  As Magistrate Judge Katz observed, Plaintiff's deposition testimony suggests that rather than experiencing one-sided discomfort as the subject of Rampulla's abusive conduct, Plaintiff actually engaged with Rampulla in an ongoing exchange of hostilities, which included Plaintiff teasing Rampulla about not taking his medications (Pl.'s Dep. at 188-89), and mimicking or laughing at him when he made his daily announcement (Pl.'s Dep. at 195-96).

In any event, Plaintiff has provided no evidence that Rampulla's conduct unreasonably interfered with her ability to do her job.  Although she objects to Magistrate Judge Katz's conclusion on this point, her objections merely reiterate allegations that are insufficient to satisfy the fourth prong of the hostile work environment claim.  Plaintiff describes being "disrupted" and "uncomfortable," and feeling the need to leave work for the day after one allegedly "angry attack."  (Pl.'s Objections at 51)  An isolated disruption of her work day and "discomfort" as a result of Rampulla's conduct cannot reasonably be said to alter the conditions under which Plaintiff did her job.  Thus, Plaintiff has not established a *prima facie* case of hostile work

18

environment.

Had Plaintiff made out such a *prima facie* case, Magistrate Judge Katz rightly concluded

that Plaintiff could not establish Defendant's liability because she has acknowledged that

Rampulla was not a supervisor but a co-worker (Pl.'s Objections at 53 ("I dispute any contention

by anyone that Rampulla was or had senior anything as a copy passer.")).  "[W]here the

perpetrator [of harassment] is the victim's co-worker, the employer will only be liable where it

'provided no reasonable avenue for complaint or knew of the [unlawful activity] but did nothing

about it.'"  *Bampoe v. Coach Stores, Inc.*, 93 F. Supp. 2d 360, 374 (S.D.N.Y. 2000) (quoting

*Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995)); *see also*

*Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004).  There is no dispute that the Times

has an explicit policy prohibiting, and providing redress for, sexual harassment (Rahbar Decl.,

Ex. 43), and yet none of Plaintiff's complaints to supervisors asserted harassment linked to

gender.  For example, although Plaintiff complained considerably about Rampulla, she never

referred to his use of nicknames for younger women.[10]  (Rahbar Decl., Exs. 24, 26, 38)  There

---

[10] In her e-mail response to the September performance warning, Plaintiff called
Defendant's attention to Rampulla's finger shaking.  (Rahbar Decl., Ex. 38)  However, she
described it as "nervous[] shaking" that "really and truly looks like some sort of masturbation,"
and objected to the gesture happening "in front of [her] face."  (Rahbar Decl., Ex. 38 at 2)  This
e-mail also described the closeness of Rampulla's relationship with Hoenninger and complained
that Hoenninger routinely favored Rampulla and mistreated other employees at Rampulla's
behest.  (Rahbar Decl., Ex. 38 at 3 ("Whenever he can get you to yank Leo into your office for a
tear-down, he just dances up and down and hums his Sinatra tunes."))  Plaintiff also wrote that
Rampulla referred to Hoenninger as "Pumpkin."  (Rahbar Decl., Ex. 38 at 3)  In this regard, the
Court agrees with Magistrate Judge Katz's conclusion that "in the context of a defense of her
own job performance, [these statements to supervisors] did not communicate a complaint of
sexual harassment."  (Report and Recommendation at 55)  Plaintiff herself described the finger
gesture as a nervous one that only *looked* like a sexual gesture, and the nickname was raised as
indication of Rampulla and Hoenninger's complicity, not as demeaning language that impacted
the workplace for Plaintiff or other women.

can be no doubt that the Times was aware of Rampulla's difficult behavior, in part because of

Plaintiff's complaints.  But there is no evidence that Plaintiff put Defendant on notice of her

feeling that his conduct was gender-based; nor is there evidence that his behavior was overtly

sexual or pervasive in a manner that would have put the Times on constructive notice.  *See*

*Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63-64 (2d Cir. 1998) (knowledge can be imputed to

an employer if the employer knew or should have known about harassment); *Van Zant v. KLM*

*Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996).

D.  Plaintiff's Retaliation Claim

It is unlawful under Title VII for an employer to discriminate against an employee

"because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing . . ." regarding an alleged unlawful employment practice.

42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, an employee must show

(1) participation in a protected activity that was known to the defendant, (2) an adverse

employment action, and (3) a causal connection between the protected activity and the adverse

employment action.  *See Terry*, 336 F.3d at 141 (citing *Quinn v. Green Tree Credit Corp.*, 159

F.3d 759, 769 (2d Cir. 1998)).  Magistrate Judge Katz properly applied the *McDonnell Douglas*

burden shifting analysis to Plaintiff's retaliation claims and found that there was no evidence that

would permit a rational trier of fact to conclude that Plaintiff's claimed protected activity was

known to Defendant at the time of, or could have caused, Plaintiff's termination or transfer.

(Report and Recommendation at 34-36)

Plaintiff contends she engaged in the following protected acts when she: (1) filed a claim

with the EEOC on October 21, 2002 (Rahbar Decl., Ex. 45); (2) stated at the October 17, 2002

meeting that she was going to the EEOC about Defendant's conduct (Pl.'s Aff. ¶¶ 29-30); and (3) sent a letter, dated June 4, 2002, to Times publisher, Arthur Sulzberger, complaining about unfair treatment (Rahbar Decl., Ex. 24). As Magistrate Judge Katz concluded, the first of these actions cannot support a retaliation claim because Defendant did not receive notification of the EEOC complaint until November 4, 2002, after Plaintiff's termination in October. (Report and Recommendation at 35)

With respect to Plaintiff's statement to Behrendt at the October 17, 2002 meeting, the statement was concurrent with or on the heels of (but in no event before) Defendant's indication that Plaintiff would be terminated if she did not agree to improve her performance. (Pl.'s Dep. at 446-47) Plaintiff objects to Magistrate Judge Katz's conclusion that "the adverse employment action had been set in motion well before the Times was aware of any protected activity Plaintiff intended to engage in," and contends that she was not aware of any steps towards her termination other than the warning concerning her tape recorder, and emphasizes Hoenninger's deposition testimony that there was no plan to terminate Plaintiff. (Pl.'s Objections at 49-50) Yet, this position flatly contradicts Plaintiff's deposition testimony that she believed Hoenninger and others were orchestrating her termination long before the October 17, 2002 meeting. (Pl.'s Dep. at 476-77) Moreover, prior to the October 17 meeting, Plaintiff received two letters clearly indicating that her failure to comply with specified directives could result in her termination — to wit, the September performance warning, and the October 8, 2002 letter setting forth the reasons for Plaintiff's suspension and warning her of the consequences of her continued refusal to meet without a tape recorder. (Rahbar Decl., Exs. 39 and 40) Regardless of Plaintiff's continued hope that employment conflicts might be resolved in her favor (Pl.'s Objections at 49-50), these letters

21

record the substantial progress that had been made towards Defendant's adverse employment action *before* Defendant was aware of Plaintiff's stated intent to file a complaint with the EEOC. As Magistrate Judge Katz found, Plaintiff has presented no evidence that would permit a trier of fact to find a causal connection between her statements on October 17, 2002, and her termination.

Finally, to the third alleged protected act — the letter to Sulzberger — it cannot be considered a protected act as the letter itself did not identify or claim any unlawful discriminatory conduct.[11]  (Report and Recommendation at 34 n.11)  Moreover, even if Plaintiff had established a *prima facie* case of retaliation, for the reasons cited by Magistrate Judge Katz and discussed above, Defendant met its burden of demonstrating a legitimate, non-retaliatory basis for Plaintiff's termination.  Among other reasons, Defendant terminated Plaintiff for insufficient productivity, inappropriate behavior towards colleagues, and her refusal to commit to improving her performance on the job.  (Report and Recommendation at 39-40)

---

[11] Plaintiff has made no objection to this portion of the Report and Recommendation and the letter speaks for itself.

DISMISSED the claims. This terminates this case.

case.

SO ORDERED.

Dated:     October 11, 2006
          New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

23

Neil H. Abramson, Esq.
Peter B. Rahbar, Esq.
Proskauer Rose LLP (New York)
1585 Broadway
New York, NY 10036
212-969-3001
Fax: 212-969-2900
*Counsel for Defendant*

24